Judgment reversed, and a *venire facias
de novo* awarded.

---

DUNWOODIE *against* REED.

IN ERROR.

*Chambers-
burg.*
—
October.

THIS was a writ of error to the Common Pleas of *Adams* county, in an ejectment brought by *Hugh Dunwoodie* against *James Reed*, in which judgment was given for the defendant, upon a special verdict.

*John Crawford*, being seised in fee of the lands in dispute, devised as follows, by his will, dated the 29th *October*, 1771. "Then with respect to my real estate or plantation "whereon I now live, (describing it,) with all other my "rights and claims unto lands, I give and bequeath the same "with all its appurtenances unto my daughter *Jane Dun-* "*woodie*, during her natural life, for her sole use and behoof, "and at her decease, I will and order the aforesaid es- "tate unto her male heir, viz. *John Dunwoodie*, if alive at "her death, to him and to his heirs forever; otherwise, unto "her next male heir, unto him and to his heirs and assigns "forever; further, I will and order, that the said *John Dun-* "*woodie*, or whosoever shall live to come unto the estate of

*A, devised to his daughter B, during her natural life, for her sole use and behoof, and, at her decease, unto her male heir, C, if alive at her death, to him, and to his heirs forever; otherwise, unto her next male heir, unto him and to his heirs and assigns for ever; and further directed, that whosoever shall live to come unto the estate of her male heir, shall, three years after possession of said*

estate, pay unto the other heirs of the said B, 200 pounds, to be equally divided amongst them. *Held*, that B, took an estate for life, with concurrent contingent remainders in fee to C, or such person as, in the event of his death in the life-time of B, should be her heir male.

*Query*, whether a common recovery suffered by the tenant for life, destroys contingent remainders, in Pennsylvania?

| 3 SR | 435 |
|------|-----|
| 214  | 152 |

| 3 SR | 435  |
|------|------|
| f221 | 1357 |

" her male heir, shall, three years after possession of said " estate, pay unto the other heirs of said *Jane Dunwoodie*, the " sum of 200 pounds, out of the estate, to be equally divided " amongst them, to their use and behoof forever." At the date of this will, the said *Jane Dunwoodie* had issue, viz. the said *John Dunwoodie*, and *Rosanna, David, Anne, Sarah,* and *Hugh*, the plaintiff. *John Crawford*, the testator, died the 1st *January*, 1772. *John Dunwoodie* died in the year 1780, unmarried and without issue, his mother being then living. *David Dunwoodie* died in the year 1780, (his mother living,) leaving issue, one daughter *Isabella. Jane Dunwoodie*, the daughter of the testator, entered into the premises after his death, and in *April*, 1791, suffered a common recovery with single voucher, the uses whereof she declared to be for 'herself in fee simple. She afterwards executed a conveyance in fee, to *James Reed*, the defendant, and died.

*Kelly* and *Watts*, for the plaintiff in error, contended, **1.** That *Jane*, the only daughter of the testator, took an estate tail; or if not, that she took an estate for life, with a vested remainder to her son *John*, in fee, with an executory devise over in case of *John*'s dying in his mother's lifetime, to such person as should be the male heir of *Jane*, at the time of her death ; which, in the event that had happened, was her third son, *Hugh*, the plaintiff in error. The capacity of taking at present, in case the previous estate were removed, makes it a vested remainder. Here the devise is to *John Dunwoodie*, by name, who is capable of taking *instanter;* though his estate is subject to be defeated by his death without issue male. The time when this estate was to come in possession, was the death of *Jane;* but the interest vested immediately. But whether the estate devised to *John*, was a vested or contingent remainder, it was a devise of the fee; and the limitation over was an executory devise not barred by the recovery. They relied on the case of *Gulliver* v. *Wicket*.(a) If there was nothing to destroy the estate of the plaintiff in error, he was entitled as the person designated by the devise. It is no objection in a devise, that he is not heir general as well as special. They also cited *Goodright* v. *Serle*.(b)   *Taylor* v. *Biddal*.(c)   *Carth.* 310. 5

(a) 1 *Wils.* 105.          (c) 1 *Eq. Cas Ab.* 188. 2 *Mod.* 289.
(b) 2 *Wils.* 29.

*Bac. Ab.* 781. *Dy.* 127. *Co. Lit.* 164. *a. Brown* v. *Bark-* 1817.
*ham.(a) Barker* v. *Wall.(b) Long* v. *Beaumont,(c) Jackson*
v. *Merril.(d) Ashton* v. *Ashton.(e)* 10 *Mod.* 424. *Dormer* v.
*Packhurst.(f) Lethulier* v. *Tracy.(g) Findlay* v. *Riddle.(h)*
and the cases cited by YEATES J. in his opinion. *Ginger*
v. *White.(i) Fearne,* 148. 150, 151. 306. 316. 319. 393. 400.
416. *Lomax* v. *Helmedon.(k)*

DUNWOODIE
v.
REED.

2. The recovery suffered by *Jane,* if she was tenant for
life, and the devise over, in case *John* should not be living
at her death, was a contingent remainder, did not, under the
laws of *Pennsylvania,* work a forfeiture of her estate for life,
nor bar the contingent remainder. The only effect that a
common recovery ever had in *Pennsylvania,* beyond that of
an ordinary conveyance, was under the act of assembly
passed on the 27th *January,* 1749–50, for " barring of es-
tates tail." 1 *Sm. Laws,* 203. So, it has been decided in
*M'Kee's lessee* v. *Pfoutz,(l)* that a conveyance by a tenant, by
the courtesy, by deed of bargain and sale, does not work a
forfeiture. For although the act of assembly of *May* 28th,
1715, (1 *Sm. Laws,* 94,) declares, that it shall be of the same
force and effect as deeds of feoffment, the Court would not
sanction the doctrine of forfeiture. The doctrine of seisin
and disseisin, and of forfeiture of estates, was the fruit of
the feudal system, which never had force in *Pennsylvania,*
and is repugnant to the genius of its institutions.

*Dobbins* and *Cassat,* contra, insisted, that if it was an ex-
ecutory devise, at the death of *Jane,* there was no person *in
esse,* answering the description of *next heir male* in both its
parts ; consequently, *Jane* took the whole in fee as heir of
the testator. But the estates limited after the death of *Jane,*
were neither of them executory devises, but contingent re-
mainders ; because, where there is a preceding freehold ca-
pable of supporting it, the estate must be construed a con-
tingent remainder, and not an executory devise. The de-
vise to *John* is dependent on an event which may never
happen, viz. his surviving *Jane ;* and he was to take only in

(*a*) 1 *Str.* 42. *Prec. in Ch.* 468.
(*b*) 1 *Ray.* 185.
(*c*) 1 *P. Wms.* 230. 233.
(*d*) 6 *Johns.* 189.
(*e*) 1 *Dall.* 4.
(*f*) 3 *Atk.* 135.

(*g*) 3 *Atk.* 783.
(*h*) 3 *Binn.* 139.
(*i*) *Willes,* 348.
(*k*) 3 *P. Wms.* 176.
(*l*) 3 *Dall.* 486.

that event. Here were several contingencies on which the estate was to vest; and on the death of *Jane*, whoever was heir male took at once, and the rest were defeated. It is ruled by the same principle as the case of *Luddington* v. *Kyme*.(a) They also cited *Ives* v. *Legge*.(b) *Purefoy* v. *Rogers*.(c) *Co. Lit.* 362. a. *Archer's Case*.(d) *Marks* v. *Marks*.(e) *Boraston's Case*.(f) *Minshall* v. *Minshall*.(g)

2. Being a contingent remainder, it was destroyed by the recovery suffered by *Jane Dunwoodie*, in 1791, and the title in fee vested in her. There is no authority to prove, that the common law on the subject of recoveries is not extended to *Pennsylvania;* or that the act of 1749–50, is to be considered as restricting their operation. They have become for a long time past in *England*, an usual mode of conveyance, and are not to be distinguished from other assurances, as to their adoption here, in cases where they are suitable or necessary. The spirit of our laws favours the barring of entails, and strict settlements by way of remainder; and the effect of a recovery in preventing perpetuities, ought to be encouraged.

TILGHMAN C. J. *John Crawford*, being seised in fee, of the lands in dispute, devised as follows, by his will, dated 29th *October*, 1771. " Then, with respect to my real estate " or plantation whereon I now live, (describing it,) with all " other my rights and claims unto lands, I give and bequeath " the same with all its appurtenances unto my daughter, *Jane* " *Dunwoodie*, during her natural life, for her sole use and " behoof, and at her decease, I will and order the aforesaid " estate, unto her male heir, *viz. John Dunwoodie*, if alive " at her death, to him and to his heirs for ever; otherwise, " unto her next male heir, unto him and to his heirs and " assigns for ever; further, I will and order, that the said " *John Dunwoodie*, or whosoever shall live to come unto the " estate of her male heir, shall, three years after possession " of said estate, pay unto the other heirs of said *Jane Dun-* " *woodie*, the sum of 200 pounds, out of the estate, to be " equally divided amongst them, for their use and behoof for

(a) 1 *Ld. Ray.* 203.
(b) Cited 3 *T. Rep.* 488.
(c) 2 *Saund.* 380.
(d) 1 *Co.* 66.

(e) 1 *Str.* 129.
(f) 3 *Co.* 19. 21.
(g) 1 *Alk.* 411.

" ever." At the date of this will, the said *Jane Dunwoodie* had issue, viz. the said *John Dunwoodie*, and *Rosanna, David, Anne, Sarah,* and *Hugh,* the plaintiff. *John Crawford,* the testator, died 1st *January,* 1772. *John Dunwoodie* died in the year 1780, unmarried and without issue, his mother being then living. *David Dunwoodie* died in the year 1780, (his mother living,) leaving issue, one daughter, *Isabella. Jane Dunwoodie,* the daughter of the testator, entered into the premises after his death, and in *April,* 1791, suffered a common recovery with single voucher, the uses whereof she declared to be, for herself in fee simple. She afterwards executed a conveyance to *James Reed,* the defendant in fee, and is since dead.

This case has been very elaborately argued, upon several points, some of which were not material. I shall take notice of such only as appear to me to be of importance.

1. It was contended, on the part of the defendant, that *Jane Dunwoodie* took an estate *tail;* but it is very clear, that she took no more than an estate *for life.* The words are expressly for life, and the intent of the testator was to give an estate for life, with remainder in *fee simple,* to the person who should be her heir male at the time of her death. If she took an estate tail, the will would be defeated, because her son, taking through her, would take an estate tail by descent, whereas it was intended, that he should take a fee simple. There is no difficulty in effectuating the intent of the testator, as it never has been denied, since *Archer's* case, that *heir male,* with words of inheritance annexed, was a sufficient description of the person, to enable the devisee to take by purchase. There is nothing, therefore, in the will, which, either by expression or implication, can give *Jane Dunwoodie* more than an estate for life.

2. Was there any estate *vested* in *John Dunwoodie,* during the life of his mother? The words of the will are express, and plain, that *John* was only to take, *if he should be living at the time of his mother's death.* Nothing, therefore, but some great inconvenience, tending to destroy the testator's main intent, or some opposing rule of law, can prevent the estate of *John,* from being *contingent.* Of the intention of the testator, there can be little doubt. He gave his daughter an estate for life, and it was his desire, that the fee simple should go after her death, to the person, whoever he might

be, who should be her *male heir at the time of her death* ; but this could not be known until the time of her death ; therefore, the intent must have been, that no estate in fee simple should vest in any person, till after her death. Suppose it had vested in *John*, in his mother's life, and he had died leaving issue a daughter and no son, and then his mother had died, the daughter of *John* could not have taken the estate, without destroying the intent of the testator, which was, that the *male* heir of his daughter *Jane* should take. Indeed, so plain is this, that it is not contended on the part of the plaintiff, that a *daughter of John* could have taken, in exclusion of the *male heir of Jane Dunwoodie.* They say, that although the fee was vested in him, yet it would be defeated on his death without issue male. But surely it is a much more natural construction, to say, what any man of plain common sense would say, on reading this will ; that the fee simple vested in none of the devisees until the death of *Jane Dunwoodie,* because, until then, it could not be known who would be her male heir. But can the intent of the testator be carried into effect, without vesting an estate in *John Dunwoodie ?* Certainly it can. Contingent estates are well known to the law. *Next male heir*, are good words of purchase ; but who that next male heir was, under the events that have happened, is another question. There is no rule of law, in opposition to the testator's intent. The law gratifies him, and declares, that whoever may be the male heir of *Jane Dunwoodie*, at the time of her death, in him should the fee simple be vested, immediately on her death. But it is objected, that the remainder is not contingent, but vested, because it is limited to *John Dunwoodie by name ;* had it been limited to him *absolutely*, it would have been vested ; but it is not limited to him absolutely, but *on condition*, that he should be living at his mother's death. Now I take it to be a rule, that the estate is contingent, where it is limited *to a person not ascertained. Fearne*, 9. 217. That is the case here ; the estate is not given to *John Dunwoodie*, unless he should be living at his mother's death, and if not then living, it was to go to the next male heir of *Jane Dunwoodie ;* who that next male heir would be, was uncertain, and, therefore, the person was not ascertained. There was not a single moment during the life of *Jane Dunwoodie*, when it could be determined who was the person

intended by the testator to take after her death; so that the remainder, according to the rule I have mentioned, must have remained in contingency until her death.

3. A very important question is next to be considered. Was the fee simple to vest at the death of *Jane Dunwoodie*, to be considered as a contingent remainder or an executory devise? As to that, it is not to be supposed that the testator had any intent; because, in all probability, he knew nothing of the terms *contingent remainder* and *executory devise*, or the difference between them. The law, therefore, must decide. There is no part of the law more abstruse, none which requires a more laborious exertion of thought, than that of contingent remainders and executory devises. Of course, it has given birth to many nice distinctions, and occasioned no small difference of opinion. But certain principles have been established beyond dispute, and one of them is, " that where a contingent estate is limited to depend on " an estate of freehold, which is capable of supporting a re- " mainder, it shall be construed not to be an executory de- " vise, but a contingent remainder." This was the rule laid down by Lord HALE, in *Purefoy* v. *Rogers*, (2 *Saund.* 380,) and it has been adhered to ever since. According to that rule, the remainder, in this case, would be contingent, because the estate for life in *Jane Dunwoodie*, was sufficient to support it. But, in answer to this, another rule is set up, *viz.* that where a fee simple is limited after a fee simple, the second estate can pass only by way of executory devise. This is very true, and had an estate in fee been vested in *John Dunwoodie*, the rule would have applied, and no subsequent estate could have been taken but as an executory devise. The will presents a contingency with a double aspect, to be determined immediately on the death of *Jane Dunwoodie*. At that moment, an estate in fee was to vest in somebody; in *John Dunwoodie*, if living; but if not, in the next heir male of *Jane*; but in whomsoever it vested, it was *indefeasible*. There was no limitation, therefore, of a fee after a fee, but a limitation of only one indefeasible estate in fee. Let us compare this case with *Luddington* v. *Kime*, of unquestionable authority, (1 *Ld. Raym.* 203,) and it will be found, that there is a strong resemblance between them. " Devise to *Evers Armyn* for life, without impeachment of " waste, and in case he should have any issue male, then to

Vol. III.—3 K

" such issue male and his heirs for ever, and if he should " die without issue male, then to Sir *Thomas Barnardiston* " and his heirs for ever." It was decided, 1. That *Evers Armyn* took for life, with a contingent remainder to his issue male in fee. 2. That the limitation to Sir *Thomas Barnardiston*, was a contingent remainder, *Evers Armyn* having died, without ever having had issue male. In this case the question whether executory devise or contingent remainder was well considered. Every thing depended on it, because *Evers Armyn* had barred the contingent remainder by suffering a common recovery. But it has been contended for the plaintiff, that inasmuch as a contingent remainder was in the first place limited to *John Dunwoodie* in fee, that circumstance, although the devise never took effect, shall make all the subsequent limitations executory devises. This is contrary to the principle of *Luddington* v. *Kime.* But the plaintiff's counsel endeavour to support their position, by the case of *Gulliver* v. *Wickett.* (1 *Wils.* 105.) " Devise " to the testator's wife for life, and after her death, to the " child of which she is *enceinte*, and the heirs of such child " for ever, provided, that if such child as shall happen to be " born, shall die before the age of 21 years, leaving no issue " of its body, the remainder of said lands shall go, one third " to the testator's wife and her heirs," &c. &c. The fact was, that the wife was not *enceinte*, and never had a child. It was decided, 1. That the devise to the child, was a contingent remainder. 2. That the devise over, of one third to the wife, &c. was a good executory devise. This case differs from the devise in *John Crawford*'s will in two respects. 1. In *Gulliver* v. *Wickett*, the testator intended an estate in fee to his child, to precede the estate subsequently limited to his wife. 2. The estate limited to the wife was to be *in defeasance* of that before given to the child. Neither of these circumstances are to be found in *Crawford*'s will; and they are very material. In *Gulliver* v. *Wickett*, when the testator made his will, he supposed his wife to be *enceinte*, and if she had been, and the child had been born, and taken the estate intended for it, there would have been no way of giving effect to the subsequent estate to the wife, but by way of executory devise; and that was the reason of the decision. Whereas, in the case now before us, there was no intention of the testator, nor any possibility that there should

have been one estate in fee, preceding another; there was no ultimate devise, to be let in by way of *defeasance* of the first devise, because he who took first, took an estate indefeasible. If *John Dunwoodie* had taken, there could have been no question about any subsequent estate. The case of *Gulliver* v. *Wickett*, therefore, is not to the purpose, and having met with no other case which can support the plaintiff's position, it appears to me, that whoever took as heir male of *Jane. Dunwoodie*, could take no otherwise than by way of contingent remainder. There has been much ingenious argument as to the person answering the description of the *next heir male;* but there is a previous question which, in my opinion, renders that enquiry unnecessary. What was the effect of the common recovery suffered by *Jane Dunwoodie ?* If it produced a forfeiture of her life estate, no person being then in existence who could answer the description of *male heir*, the contingent remainder fell, for want of an estate to support it.

It is not questioned but that by the common law of *England*, the suffering of a common recovery by a tenant for life, is a forfeiture of his estate. It is so laid down by Sir *Edward Coke*, in his comment on *Littleton*, 362, *a.* and the reason there given, is, "that a common recovery is a common conveyance, of which the law taketh knowledge." And in *Luddington* v. *Kime*, the case turned, as before mentioned, on a forfeiture occasioned by a common recovery suffered by the tenant for life, in consequence of which, the contingent remainder was destroyed. The law of forfeiture was founded on good principle. It was a punishment of the tenant for life for an unjust attempt to injure the remainderman by passing away the fee simple of the estate. When the remainder was vested, all was right. The remainderman entered and took advantage of the forfeiture. But where the remainder was in contingency, a hardship arose by the destruction of it. This was unavoidable. It fell for want of support by a preceding estate ; but still the wrong-doer was punished by the entry of the heir. But, to be sure, there seems to be an impropriety in cases where the wrong-doer happens to be the heir ; for then, there is no one to take advantage of the forfeiture, and the wrong-doer gains the fee simple by his own wrong. This is an accidental case, but it certainly is an imperfection in the system. We are not at liberty, how-

1817.

DUNWOODIE
v.
REED.

ever, to alter it, but must take the whole as we find it. After all, it is no harder on the remainderman to be bound, than it is for the issue in tail to be bound by a common recovery suffered by his ancestor. Yet, from motives of policy, this is permitted. Our ancestors brought with them to *Pennsylvania*, all those parts of the common law which were suited to their situation. In order to prove, then, that a common recovery does not produce a forfeiture here, it must be shewn, either that it has been so ordered by act of assembly, or that the principle of forfeiture was improper in the situation of the province at its first settlement. The acts of assembly will speak for themselves, but as to the convenience or inconvenience of forfeiture, the most powerful evidence will be the practice, and the opinions generally entertained by men of the profession of the law. The act "for barring of estates tail," passed in the year 1749, is relied on, as limiting the effects of a common recovery to the single object of barring estates tail. I have examined that act carefully, and cannot perceive how any such conclusion can be drawn from it. The sole object of the act was, to provide a mode for the barring of estates tail. Such is the *title* of the law, and the *preamble* recites, that the entailing of estates, without a provision for barring them, would introduce perpetuities, prevent the improvement of estates, disable tenants in tail from providing for their younger children, and be of general detriment to the province. Then comes the enacting part, by which it is provided, that "*fines* and *common recoveries heretofore* levied, and suffered within the province of *Pennsylvania*, or which, *at any time hereafter*, shall be levied, or suffered, duly, and according to the common or statute laws of *England*, either in the Supreme Court of Judicature, within the said province, or any of the county Courts for holding of pleas, &c. within the said province, respectively, in which the lands, &c. do, or shall, lie, shall be, and are hereby declared to be, of like force and effect, to all intents, constructions, and purposes *for barring estates so intailed*, as fines and common recoveries, by the laws of *England* aforesaid, there levied or suffered, of lands, tenements, and estates, entailed within the realm, are received, declared, or enacted to be." Now this act, from beginning to end, says nothing of the effect of fines or recoveries, any further than as the means of barring estates tail. It is affirmative throughout; nor is there a word which

looks like an intent to destroy the usual effect of fines or re-coveries, in any case whatever. It is, in fact, no more than declaratory of the common law ; for it would appear from the retrospective words, *heretofore levied and suffered*, that fines and recoveries had been in use before. Indeed it is certain that they had been in use, for a search having been made, I have been informed of one common recovery suffered in the Supreme Court, and five in the Common Pleas of *Philadelphia* county, prior to the passing of the act. There were, probably, more, but they are not easily found, as the old records are in loose papers, which have not been sorted and arranged. Probably they had not been much in practice, because at that time of day there were but few men of deep learning in the profession of the law, and fines and recoveries being an unusual mode of proceeding, the gentlemen of the bar might have had some doubts as to their efficacy : but I am satisfied, the general opinion has been, that fines and common recoveries were sufficient to bar estates tail, if the act of assembly had never been made. Another argument against forfeiture has been drawn from an old act of assembly made in the year 1715. (1 *Dall. L.* iii. s. 5.) This was an act to provide for the recording of deeds. The fifth section enacts, that all deeds and conveyances, proved, or acknowledged, and recorded according to the directions of that act, shall be of the same force and effect, "*for the giving possession and seisin, and making good the title and assurance of lands, as deeds of feoffment, with livery of seisin, or deeds enrolled in any of the King's courts of record at Westminster, are, or shall be of in the kingdom of Great Britain.*" It was decided by this Court, in the case of *M'Kee's lessee* v. *Pfoutz*, (3 *Dall.* 486,) that a conveyance by deed of bargain and sale, acknowledged and recorded, of an estate in fee simple, by a tenant by the courtesy, was not a forfeiture of his estate. The reason is plain ; a deed of bargain and sale operates by way of use, and conveys no greater estate than the bargainor may lawfully convey ; therefore it never was considered as inducing a forfeiture on common law principles. But the object of the act of assembly was, not to create forfeitures where none existed before, but only to give greater efficacy to the deed, and to simplify the mode of conveyance of real estate. The act of assembly, says M'Kean C. J. meant only to give to a grant of land a greater effect, on recording the

deed, than it previously had, without livery of seisin; it never contemplated that circumstance as an instrument to work a forfeiture, on the common law doctrine of alienation by tenant for life or years. To the same effect was the opinion of SHIPPEN J. This was giving the act a fair construction. It was meant for the ease and benefit both of grantor and grantee; and it would have been perverting a liberal intent to a mischievous purpose, to make this act the means of involving the grantor in a forfeiture, where none existed before.

The case of *Findlay* v. *Riddle*, 3 Binn. 139, decided by this Court, has been also relied on by the plaintiff's counsel, but I think without reason. *John Findlay*, supposing himself seised of an estate tail, executed a deed of bargain and sale, for the express purpose of barring the entail, according to the act, " to facilitate the barring of entails," passed the 16th *January*, 1799. The sole object of this act was, to give to persons *seised of estates tail*, the right to bar them by any form of conveyance which would have been sufficient to convey an estate in fee simple, provided it was the intent to bar them, and that such intent was expressed in the deed. But the act is confined to deeds made *by persons seised of estates tail*. Now the Court decided, that *John Findlay* was *not seised of an estate tail*, but only of an estate *for life* with a contingent remainder to his issue, as tenants in common, in fee simple. There was no ground, therefore, for the operation of the act of assembly. If *John Findlay* had suffered a common recovery, the case would have been in point; for, by the decision of the Court, the contingent remainder was established, and the person claiming under it, recovered. But it was not even suggested by the counsel for the defendant, who claimed under *John Findlay* on the principle of his being seised in tail, that the conveyance executed by him, was a forfeiture of his life estate; because he had done no more than execute a deed of bargain and sale, which had been determined to be no forfeiture, in the case of *M'Kee's lessee* v. *Pfoutz*. It appears to me, therefore, that the plaintiff's case is not helped by the decision in *Findlay's lessee* v. *Riddle*.

Let us now consider, what has been the general understanding on this subject. I confess I have always supposed, that the common law principle of forfeiture has been adopt-

ed here, in cases of common recovery. I have often heard the subject mentioned by my elders, who are no longer living, and do not recollect a doubt being expressed on the point. Of the opinion of the late Chief Justice CHEW, I can speak with certainty; and his long practice, and information derived from early tradition, must have carried him back to the time of the first common recoveries in *Pennsylvania*. I am very certain, that this principle has been acted upon, and many estates depend upon it. A recent instance has occurred, which must be known to many. The great *Hamilton* estate, near *Philadelphia*, which was sold a few years ago, on a ground rent of $ 36,000 a-year, and which has been since cut up and sold to a great many persons, was tied up by the late Governor *Hamilton*'s will, to a number of life estates, with contingent remainders depending on them; but he omitted to appoint trustees for preserving the contingent remainders; he also devised, under the same restrictions, a very large estate in *Lancaster* county, including the city of *Lancaster*, and some hundred acres adjoining. On the subjects of that will, I believe I may safely say, that as able counsel was consulted as any which this country affords; and under the direction of that counsel, common recoveries were suffered, for the purpose of destroying the contingent remainders. These recoveries, and others, were suffered, and many estates sold for valuable and full considerations, on the faith of the common law, which had never been altered, either by act of assembly, or judicial decision. The evidence derived from general opinion is corroborated by a decision of the late President BIRD WILSON, in the case of *Rattew* v. *Cornish*, the only case I have been able to find, where this point came directly into question. This decision, though not authority binding this Court, is entitled to great consideration; and I am informed, that in consequence of it, a common recovery was afterwards suffered in Judge WILSON'S district, for the purpose of barring a contingent remainder. The objection, that the law of forfeiture is founded on feudal principles, is of no weight. Those principles are so interwoven with every part of our system of jurisprudence, that to attempt to eradicate them would be to destroy the whole. They are massy stones worked into the foundation of our legal edifice. Most of the inconveniences attending them have been removed, and the few that remain

1817.

DUNWOODIE
v.
REED.

**1817.**

DUNWOODIE
*v.*
REED.

may easily be removed, by acts of the legislature. In that way, the future may be provided for, without injuring the past. But should this Court undertake to shake a principle, which has become a rule of property, the mischief would be incalculable. The Court cannot say, that what *has been done* shall stand, and *in future*, the law shall be altered; their decision must be retrospective as well as prospective. Moreover, I doubt very much, whether it be not the policy of this country to facilitate the destruction of contingent remainders, as well as of estates' tail. They tend to prevent the free enjoyment and alienation of land; whereas the spirit of our constitution and laws, has a direct contrary tendency. They tend to throw large estates into *one hand;* but the object of our laws, is to divide them among *many*. In short, we shall probably find, upon reflection,. that our ancestors who suffered contingent remainders to be barred in this way, were not so unwise, as, at first thought, we might suppose them. The subject is of great importance, and upon full consideration I am of opinion, that it is safest to adhere to a principle adopted in the earliest times, by the people from whence we derive our laws, persevered in to the present moment, and never.contradicted by the decision of any Court, or the act of any legislature in this country. The contingent remainders being destroyed, the plaintiff has no title, and therefore the Court of Common Pleas were right in deciding against him. I am of opinion, that the judgment should be affirmed.

GIBSON J. There is no ground to pretend, that *Jane Crawford* took an estate tail by implication, or that the rule in *Shelly*'s case is at all applicable. In *Archer*'s case, 1 *Rep.* 66, *b.* a devise to *A,* for life, and afterwards to the next heir male of *A, and to the heirs male of the body of such heir male,* was held an estate for life in *A.* The cases on the subject are collected in a note to *Legate* v. *Sewal,* 1 *P. Wms.* 87. Here it was the clear intention of the devisor, that the person, who should succeed *Jane*, should be a purchaser, and also that he should have a fee, which is inconsistent with the notion of his deriving the inheritance from her; because, if she even took more than an estate for life, she could have had only a fee tail. Three questions arise, 1. Is the limitation over after the remainder to *John*,

1817.
Dunwoodie
v.
Reed.

a contingent remainder, or an executory devise? 2. If a contingent remainder, is it barred by the common recovery suffered by *Jane?* 3. If not barred, can the plaintiff take as heir male, he not being heir general?

It is contended, that the remainder to *John* was vested, and that consequently the further limitation to the heir male of *Jane,* can take effect only as an executory devise. I think it clear, the estate was not to go over till the death of *Jane.* The devisor considers it uncertain, who " shall live to come " into the estate of heir male," and ultimately take under that description. He does not impose on *John,* by name, the duty of paying the 200*l.* to the other heirs of *Jane,* which might naturally be expected, if he had contemplated a vested interest in him, subject only to be divested by his death in the lifetime of *Jane;* he imposes it in general terms on whomsoever might succeed to the estate:—And on the question of intention, his ordering the estate to *John,* " at her de-" cease," is not without weight; although I agree expressions of that kind relate rather to the time when the estate is to fall into possession, than to the time of vesting the interest, and that they will not of themselves make a remainder contingent. It is clear the person who was to succeed *Jane* was to be a male, and that the devisor considered that person as being uncertain. If the devise were to *Jane* for life, with remainder to her next heir male and his heirs, there would be an end of difficulty; such remainder would be contingent. It is the personal designation of *John,* who was to take in a certain event, that creates doubt. This designation of *John* removes, as to him, the uncertainty of person; but it also introduces an uncertain event, (his surviving *Jane,*) which I apprehend must have happened before the estate could vest in him. It is said a *present capacity* of taking in possession as soon as the particular estate is spent, is the criterion which distinguishes a vested from a contingent remainder. I admit it is; but was there a present capacity in *John?* It would be doing violence to the intention and words of the devisor to say there was. The estate was limited to *John,* " *if* alive, till after her decease." Could he have entered in the lifetime of *Jane,* in case she had done any act to work a forfeiture of her life estate? There are no words of present devise to him, vesting a present right of future enjoyment. There is a class of cases, where a re-

mainder is limited by words, that seem to import a contin-
gency, though in fact such words do not amount to a condi-
tion precedent, but only denote the time when the remainder
is to take effect in possession; and it is by confounding these
cases with the present, that doubt arises. Such is *Boraston*'s
case, 3 *Rep.* 19, in which land was devised to *A*, and *B*, for
eight years, remainder to testator's executors, in trust, till
*Hugh Boraston* should accomplish his full age of 21, at
which time he was to enjoy the same, to him and his heirs.
*Held*, that his attaining the age of 21, was not a condition
precedent, and that the adverbs of time, " when," " then," &c.
did not make any thing necessary to settle the remainders, but
that it was equivalent to a devise to the executors till the son
attained the age of 21, with a. vested remainder to him in
fee. So in *Matthew Manning*'s case, 8 *Rep.* 95, *b.* wherever
the whole property is devised with a particular interest given
*out of it*, it operates by way of exception out of the absolute
property. Such also was the case in *Swinburne*, 154, " I de-
" vise my land to my son *John*, *after the death of my wife.*"
So also *Kerlin's lessee* v. *Bull*, 1 *Dall.* 175. " To my eldest
" son *John*, *when* he arrives at the age of 21." And such
was the principle that governed in *Doe* v. *Provoost*, 4 *Johns.*
61, as to the vesting of the estate. The same principle in
*Ray* v. *Enslin & Ray*, 2 *Mass. Rep.* 554, with many others
that might be cited. But in no case is it decided, that the
words, " if he shall be alive till after" a particular period, do
not make a condition precedent. In *Brownsword* v. *Ed-
wards*, 2 *Vez.* 243, (the only decision directly on the point
that I can find,) the case was a devise to trustees to receive
the rents and profits, " till that little boy, commonly called
" *John Brownsword*, should attain the age of 21," and to
place the same at interest in the mean time for the improve-
ment of the estate, " *and if he should live to attain the age of*
" 21, *or have issue*, then to the said *John Brownsword*, and
" the heirs of his body; but *if* the said *John Brownsword*
" *should happen to die*, before the age of 21, and without
" issue," then over; *held*, that the attaining the age of 21, or
having issue, was a condition precedent to the vesting of the
estate. I cannot distinguish this case from that under conside-
ration, which is a devise to *Jane* for life, and at her decease
to her next male heir *John*, *if alive till after her decease;*
otherwise over. It is not a little remarkable, that Sir *William*

1817.

DUNWOODIE
v.
REED.

*Blackstone*, in his Commentaries, vol. ii. p. 170, puts the very case under consideration as an instance of a contingent remainder limited, not to an uncertain person, but to take effect on the happening of an uncertain event. " Where land " is given to *A*, for life, in case *B* survives him, then " with remainder to *B*, in fee ; here *B* is a certain person, but " the remainder to him is a contingent remainder, depending " on a dubious and uncertain event, the uncertainty of his " surviving *A*." This authority is decisive, but if it were not, I would lean against the opposite construction, which I apprehend would conduce to defeat the intention of the testator, by letting in a female at the death of *Jane*. For it is only by making the remainder to *John* contingent, that the limitation to *David* is rendered contingent also. Where the first limitation is contingent, the subsequent limitations will be so too. 1 *Fearne*, 349. Now the limitation after that to *John* is not expressly to the next heir male living at the death of *Jane;* consequently *Isabella*, the daughter of *David*, might have been entitled, if the estate had vested in *John*. *Nemo est hæres viventis:* but a devisee may take by special description as heir in the lifetime of his ancestor, if the testator evince his intention to be so ; as if he take notice, that the ancestor is living. *Darbison on dem. of Long* v. *Beaumont*, 1 *P. Wills.*229. *Goodright on dem. of Brooking* v. *White*, 2 *Bl. Rep.* 1010. Here, *John* in the lifetime of *Jane*, is described as her heir, which shews the testator did not use the word heir in its technical sense, and there can be no doubt he intended to apply it to *David*, who stood next in the order of male succession, in the same sense he did to *John*. If then, " next heir male" be a sufficient *designatio personæ* in the lifetime of the ancestor, (and I think it was under all the circumstances of this will,) and *John*'s remainder had vested, there can be no question but the estate would have vested in *David* also, on the death of *John*, without male issue in the lifetime of *Jane;* in which case *Isabella*, as heir of *David*, would be entitled :—a most unfortunate construction for the plaintiff.

It is argued, however, that should the remainder to *John* be contingent, still, as it was a disposition of the whole fee, no further limitation of the estate could take place, except by way of executory devise ; and to this point is cited *Gulliver* v. *Wickett*. This case proves, that where there is a limita-

1817.
_____
DUNWOODIE
*v.*
REED.

tion, after a devise in fee not vested, which is to take effect *in defeasance* of the fee *on an event subsequent to its having become vested*, it can do so only as an executory devise. 2 *Fearne Rem.* 19. But two or more several contingent remainders in fee may be limited, the one to be *substituted* for the other, instead of being dependent and to take effect in succession. *Luddington* v. *Kime*, 1 *Ld. Raym.* 203. *Doe* v. *Holme*, 2 *Bl. Rep.* 777. From all the cases, the rule seems to be this :—where *both* limitations are to take effect, the latter can do so only as an executory devise ; for a remainder originally contingent, but afterwards vested by the happening of the contingency, is essentially the same as if it had been vested at its origin ; but where both are limited alternately on the same event, by the happening of which one is to vest in exclusion of the other, there both are contingent remainders. Now the last limitation was to take effect only in case the estate never vested in *John ;* for, as he could not take at all without surviving *Jane*, the further limitation would have been gone forever on the happening of that event, and the estate would have vested in him absolutely. But neither limitation could vest in the lifetime of *Jane*, for the contingency in this case could not happen before the end of the original specified duration of the particular estate, but awaited its natural expiration. The alternative presented, therefore, was strictly a single contingency with a double aspect, from which either limitation was to start, as the event (which could not happen but in one of two ways,) should turn out. There is no force in the objection, that there was a succession of contingencies to happen before the plaintiff could take, for that *David* must also have died, leaving *Jane.* I put *David* entirely out of view ; for the plaintiff's title does not accrue through him but paramount to him. Never having answered the description of the ulterior devisee, he at no time had an interest, and is to be considered as if he had never existed. The limitation was not to him personally, but to whomsoever happened to be heir male of *Jane* at her death. That person was an unit, not including those that might by possibility be so. I therefore think the case falls within the principle of *Luddington* v. *Kime*, and as the limitation may be good as a contingent remainder, we are not at liberty to construe it to be an executory devise.

The *Lessee of Harris & wife* v. *Potts & wife*, 3 *Yeates,*

141, in many of its features bears a striking resemblance to the present case. It was a devise of a plantation to the testator's sister, " *Elizabeth Davis* and to her male heir for-" ever, that is to say, her son *Thomas Davis*, in case he " shall live to come to age as aforesaid and enjoy it, but if " the said *Thomas Davis* should die before then, then I will " and order all the said estate to descend to my afore-men-" tioned cousin, *John Campbell* and his heirs forever," he paying certain legacies, and in default of issue, over. Here the remainder was supported as an *executory devise*. But it was unnecessary for the plaintiff's counsel to take any distinction, as it was sufficient for their purpose, that the limitation over was good in any shape, and that it was good in some shape, was not doubted or denied by the defendant's counsel, who put their case on *Thomas Davis* having taken a vested estate tail then unexpired. It is evident the distinction established in *Luddington* v. *Kime* was not in the view of the Court; nor is there any thing in their inadvertent *dictum*, that the limitation over took effect as an executory devise, that can shake the authority of that case which has never yet been doubted.

The next question is one of the very first importance. It is certain, that in *England*, a common recovery suffered by the tenant of the particular estate, will defeat a contingent remainder. Vested remainders are protected from collusive recoveries, by the stat. 14 *Eliz.* ch. 8, which renders them void as to those in remainder. Still, however, the suffering such a recovery is a forfeiture of the tenant's estate, and he, next in remainder, shall enter. *Co. Lit.* 362. *a.* It results, that in *England*, unless a remainder originally contingent, and depending on such estate, become vested by the happening of the contingency, before the recovery be suffered, it will be defeated by the destruction of the particular estate. The omission to provide for the contingent remainder-man, must surely have been accidental. It is monstrous, that the tenant of the particular estate, should be permitted, by his own act, to defeat the intention of the grantor, in any case where the execution of that intention is not inimical to public policy; and it is still more monstrous, that he should be punished through the sides of the innocent contingent remainder-man. In fact, the cure thus becomes the very disease it was intended to remedy. In this instance, the idea of punishing

1817.          *Jane*, by a forfeiture of her life-estate, if she is at the
same moment to acquire the reversion in fee, as heir at
law of the testator, is perfectly ridiculous. Unless, there-
fore, I find myself bound by a series of decisions, establish-
ing the doctrine as the law of this state, I shall not accede
to it. There is, however, no decision to give it counte-
nance. It is probable, common recoveries were partially
in use here, a short time previous to the act of the 27th
*January*, 1750; but that act limited and defined their ope-
ration, "to be of like force and effect to all intents, con-
"structions, and purposes, *for barring estates entailed*, as
"fines and common recoveries, by the laws of *England*,"
are declared to be. Then why give a recovery *any* effect,
where there is no entail to bar? I cannot recognise it as a
mode of assurance in any other case. In this construction
I am fortified by the analogy to be drawn from the decision
of this Court, in *M'Kee's lessee* v. *Pfoutz*, 3 *Dall.* 486.
By the act of 28th *May*, 1715, deeds recorded, "shall be of
"the same force and effect here, for *giving possession and*
"*seisin*, and *making good the title*, and assurance of the said
"lands, &c. *as deeds of feoffment with livery of seisin.*" Yet
it was held, that a conveyance in fee, by a tenant by the
curtesy, created no forfeiture, the Court declaring the act
never meant to introduce a forfeiture, but that its operation
was restricted to giving possession and seisin, by the very
letter. In like manner, is not the operation of a common re-
covery, expressly restricted to barring estates tail, by the
very words of the act of 1750, and shall we enlarge its ope-
ration, beyond the letter or intention, to the barring of con-
tingent remainders, when, in all probability, common reco-
veries owe their very existence in *Pennsylvania*, to that act?
Before that period, there is no evidence, that recoveries had
been established here by practice, as a method of barring
even estates tail, but strong evidence to the contrary. "There
"was a time," says Chief Justice SHIPPEN, "within my
"remembrance, when lawyers held, that common recoveries
"for docking estates tail, could not be legally suffered in
"*Pennsylvania*, and the first that was suffered, will be found
"among the records of the Common Pleas in my hand-wri-
"ting, when a young student. The practice, however, was
"not generally adopted, till the passing of the act of assem-
"bly, in 1750, which expressly authorised it. As lands, by

DUNWOODIE
*v.*
REED.

" means of entails, were before this time daily rendered un-
" alienable, the only way of docking them, was by the in-
" strumentality of the very acts of assembly under our con-
" sideration, (intestate acts,) and nothing was more common,
" and it was every day's practice, for lawyers to advise the
" instituting suits against the executors of the testator, for
" the sole purpose of taking the entailed lands in execution,
" and barring the entail. Many lands are now held under
" these titles. *There was then but one opinion on the subject.*"
*Lessee of Morris* v. *Smith*, 1 *Yeates*, 244. On this opinion, it
is unnecessary to comment, further than to observe, that the
late venerable Chief Justice, must have been quite a youth at
the passing of the act of 1750, and that of course, the first
common recovery in *Pennsylvania*, must have been suffered
immediately preceding that period. No lawyer had a better
opportunity of acquiring correct information on the subject,
and his general accuracy of recollection is undoubted. But
the preamble of the act itself is sufficiently explicit, as to the
views that were entertained at the time. The legislature,
after reciting, that many evil consequences would result from
entailing estates, without a provision for barring them, de-
clare, that "*for the preventing whereof for the* FUTURE," fines
and recoveries then suffered, or to be suffered thereafter,
should be valid. Is not this a declaration, that fines and re-
coveries were considered invalid theretofore, and that this
part of the common law was not then introduced? Else, why
legislate at all on the subject? Because, say the counsel, it
was necessary to declare what the common law was. No
such matter; there never was a doubt since *Taltarum*'s case,
but that by the principles of the *English* common law, an
entail might be barred by a common recovery. It was
not even to remove a doubt, whether this part of the com-
mon law had been adopted, (there was more than a doubt
that it had not,) but as the legislature declare, to prevent for
the *future*, the pernicious consequences of *perpetuities*. To
limit the operation of recoveries, undoubtedly, was not the sole
object of the act, but also to introduce them as a mode of con-
veyance; and being thus introduced, it is evident they were
expressly restrained to the barring of entails. But I readily
admit, that necessity, unaided by any act of assembly, would,
long before the present period, have compelled the Courts
to sustain fines and recoveries; and that thus introduced,

they would have been accompanied with all their common law incidents; but the question is, how did the matter stand at the passing of the act. It is evident, the legislature never supposed contingent remainders could be barred by *any* mode, nor did they *intend* that they should; for when the act of 1799, introduced a more simple and less expensive mode than the common recovery acknowledged by a deed in Court, it was exclusively adapted to the *barring of entails*. Yet the intention was to provide a substitute for the old mode, co-extensive with its whole operation, and one, that in practice, would supersede it altogether. If, then, an idea of barring contingent remainders by recoveries had been entertained, it might naturally be expected, that the act of 1799, would have provided for them as well as entails. I think, I have thus shewn, that recoveries have no force here, but what they derive from the act of 1750. In the absence of judicial decision, the uniform opinion of the legislature and the profession on the subject, as far as it can now be ascertained, ought to be satisfactory. My ground then is, that as common recoveries never had any force here as a part of the common law, and as they were introduced by statute, for a definite, limited, and special purpose, and to have an operation in a particular case only, they are for all other purposes, and in all other cases, without effect and void. But even were it otherwise, I would prefer giving *some* effect and meaning to the act of 1750, (rather than render it nugatory,) by supposing the legislature intended to restrain their operation, if they did not intend to introduce them; but, that they were introduced by statute, and not by the common law, the circumstance of the legislature having acted on the subject at all, the reason expressed in the preamble of the act for having so acted, and the declaration of Chief Justice SHIPPEN, all conspire to prove.

With respect to the doctrine of forfeiture by a tenant for life, there has been neither decision nor usage till within a very late period, when there was, as I am told, a single decision of a Judge of a county Court, (who is, I own, a very respectable lawyer) and also a recovery or two suffered with the express view of defeating a contingent remainder. In *Pennsylvania* therefore the idea is quite modern, and confined to the immediate neighbourhood of *Philadelphia*, where it seems to have been entertained by the bar; but in the state

1817.

Dunwoodie
v.
Reed.

at large it has never, as far as I can learn, been countenanced by the profession. The case of the *Hamilton* estate is rather an instance of experiment than evidence of settled usage. I have not the slightest fear that the doctrine I contend for would have the effect of disturbing titles ; for whatever may have been the abstract opinion of some members of the *Philadelphia* bar, (and I confess they were highly distinguished in their profession) I believe there are at most but two cases in which it was put in practice, and a recovery suffered with the express view of defeating a remainder. If, then, this doctrine of forfeiture, which is one of the oppressive incidents of feudal tenures, has not been already engrafted on our system, why should we, who profess not to have adopted the whole common law, lean towards its introduction now ? I would be the last to pull down any part of the Gothic edifice of our land title, but I would also be the last to reunite to it, a part which the wisdom of experience had retrenched. It cannot be denied, that the defeating of the remainder would, in this instance, operate most unjustly against the plaintiff. It is true, when an entail is docked, the same hardship is felt by the issue, and the intention of the donor equally frustrated : that, however, is tolerated from motives of policy only. Perpetuities are prejudicial to the general weal; and when a person is prevented from claiming under a limitation prohibited by the interest and policy of society, he has no right to complain. But as to policy, entailments and contingent remainders stand on different ground. Indefinite restriction on alienation is contrary to the genius of our laws : but restriction to a reasonable extent is tolerated. Land ought not to be transmissible like chattels ; and we have witnessed the deplorable consequences of its having become an article of commerce. Convenience, and the state of society, in this country, begin to require a more complex settlement and disposition of real property than has hitherto prevailed. This, it is said, may be effected, and these contingent interests secured, by interposing trustees to support remainders. That would have great force if every disposition of property were the deliberate act of a man in perfect health both of body and mind ; but we know that the final disposition is the last act of almost every man's life. What scrivener, usually employed on these occasions, knows

any thing about the necessity of trustees to support remainders ? Policy, and a regard for the intention of men destitute of counsel, and endeavouring to provide for the exigencies arising from the peculiar situation of their families, require that their arrangements should not be cut up by a *technical consequence* unfounded in justice or reason. By preserving these contingent estates, without the intervention of trustees, we but vary the form of effecting the same object, the estate being tied up no longer than if trustees had been actually interposed ; that is, for a life or lives in being, and twenty-one years, with the usual period of gestation, afterwards : for where the particular estate is a fee tail, undoubtedly a recovery will destroy it, and bar the remainder. This period is found perfectly to agree with the policy of the law. Mr. *Butler* informs us, 1 *Inst.* 290, *b*, note 1, that the first attempt at a *settlement* was the creation of a fee simple conditional, and that when these interests were turned into estates tail by the statute *de donis*, a simple entail of the land answered sufficiently well to preserve it in the family; but on the introduction of fines and recoveries that mode was abandoned. The present mode, also, of giving the parents successive estates for life, with successive remainders in tail to the issue, was found to have this very *inconvenience*, that the tenant for life might defeat the remainders by alienation or forfeiture ; and to remedy this as an *evil*, and as a matter of pure necessity, trustees were introduced. In *Virginia*, the legislature have taken the forfeiture away, by enacting that a fine or recovery shall pass no greater estate than the tenant had in the land at the time. All this affords practical evidence that it is an object to preserve, rather than destroy, these contingent nterests.

The last point is an objection, by the defendant, that *Isabella*, the daughter of *David*, being the heir at law of *Jane*, the plaintiff does not answer the description in the devise, not being heir general as well as male. Whatever may have been the technical notions of the profession before the case of *Wills et al.* v. *Palmer*, 5 *Burr.* 2615, the good sense of Lord MANSFIELD, and the other Judges of the King's Bench, exploded the rule contended for, as applicable to a devise : and in *Evans ex dem. Burtenshaw* v. *Weston, Co. Lit.* 164, *n.* 2, we learn the Court refused to apply it to a marriage settlement. The objection therefore fails.

I am of opinion that *Jane Dunwoodie* took an estate for life, with concurrent contingent remainders in fee to *John Dunwoodie*, or such person as, in the event of his death in the life-time of *Jane*, should be her heir male, which remainders were not barred by the common recovery suffered by *Jane*, and that at her death, the plaintiff, standing in the order of male succession, next to *John*, (who died living *Jane*) took under the devise ; and that the judgment below should be reversed; and judgment entered for the plaintiff.

DUNCAN J. gave no opinion, having been of counsel in the cause.

Judgment affirmed.